# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF ARKANSAS
# CENTRAL DIVISION

**RICHARD GILLIAM**  **PLAINTIFF**
**ADC #209415**

V.  NO. 4:20-cv-00758-LPR-ERE

**M. GEBHARDT, Lieutenant;**
**KEVIN SMITH, Jail Administrator;**
**ALEX STEFFEN[1], Deputy; and**
**KAMERON WELLS, Deputy**  **DEFENDANTS**

## RECOMMENDED DISPOSITION

**I.  Procedure for Filing Objections:**

This Recommendation for the dismissal of Mr. Gilliam's claims has been sent to Judge Lee P. Rudofsky. The parties may file objections if they disagree with the findings or conclusions set out in this Recommendation. To be considered, objections must be filed within 14 days. Objections should be specific and should include the factual or legal basis for the objection.

If the parties do not file objections, they risk waiving the right to appeal questions of fact. And, if no objections are filed, Judge Rudofsky can adopt this Recommendation without independently reviewing the record.

---

[1] The Clerk is instructed to update the docket sheet to include the full names of Defendants Alex Steffen and Kameron Wells.

## II.     Background:

Richard Gilliam, an Arkansas Division of Correction (ADC) inmate formerly detained at the Lonoke County Jail (Jail), filed this civil rights lawsuit without the help of a lawyer under 42 U.S.C. § 1983. *Doc. 2.* In his complaint, Mr. Gilliam alleges that, on February 8, 2020, Defendant Alex Steffen and Deputy Irving (not a party to this lawsuit) held him in a restraint chair for nearly five hours. According to Mr. Gilliam, when he told Defendant Steffen that he needed to use the restroom, Defendant Steffen told him that he could not do so until a "road deputy was available." *Doc. 2 at p.5.* At that time, Mr. Gilliam urinated on himself. Mr. Gilliam also complains that Jail staff had not been adequately trained to operate the restraint chair and that his restraints were "excessively tight." *Doc. 2 at p.5.*

After spending nearly five hours in the restraint chair, Jail staff moved Mr. Gilliam to cell T-2, a cell with no running water, toilet, or toilet paper. As a result, Mr. Gilliam was forced to defecate, then sleep, on the floor.

Mr. Gilliam also alleges that, based on his race and in retaliation for exercising his first amendment rights, Defendants denied his requests to return to his unit.

Mr. Gilliam sues Kevin Smith (the Jail Administrator), Deputy Alex Steffen, and Deputy Kameron Wells.[2]

---

[2] Mr. Gilliam previously moved for the Court to dismiss his claims against Defendant Gebhardt, which the Court granted. *Docs. 17, 20.*

Defendants have now moved for summary judgment on all of Mr. Gilliam's remaining claims. *Doc. 23.* Mr. Gilliam has responded to the Defendants' motion.[3] *Doc. 27.* The motion is now ripe for review.

### III. Discussion:

A.   Standard

A party is entitled to summary judgment if - but only if - the evidence shows that there is no genuine dispute about any fact important to the outcome of the case. See FED. R. CIV. P. 56; *Odom v. Kaizer*, 864 F.3d 920, 921 (8th Cir. 2017). The moving party bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Because Defendants are the moving parties, the Court will construe any disputed facts in a light favorable to Mr. Gilliam.

B.   Factual Allegations

Mr. Gilliam alleges that Defendant Steffen used excessive force against him when he placed him in a restraint chair with straps that were "excessively tight."

Defendants attach Defendant Steffen's affidavit to their motion. *Doc. 25-8.* According to Defendant Steffen, on February 8, 2020, Mr. Gilliam told him that he

---

[3] In his response to the Defendants' motion, Mr. Gilliam states that he was "intentionally denied proper care." *Doc. 27 at p.1.* Because Mr. Gilliam did not raise a deliberate-indifference claim relating to his medical needs in his complaint, the Court will not address that claim in this Recommendation.

3

was going to kill himself and had wrapped the leg of his pants around his neck. Mr. Gilliam acknowledges that he was in a "suicidal state." *Doc. 27 at 1*. According to Defendant Steffen's incident report, Mr. Gilliam then proceeded to stand on a toilet. *Doc. 25-5 at p.2.* At 7:00 p.m., Defendant Steffen placed Mr. Gilliam on suicide watch. At 7:45 p.m., Defendant Steffen placed Mr. Gilliam in the restraint chair. *Doc. 25-8 at p.1.*

Around 9:15 p.m., Mr. Gilliam requested to use the restroom. Approximately thirty minutes later, Defendant Steffen called a "road deputy" to assist in removing Mr. Gilliam from the restraint chair and to allow him to use the restroom. Defendant Steffen told Mr. Gilliam that "a road deputy [was] coming, and to hold on for about ten minutes or so." *Doc. 25-8 at p.2.* Around 9:50 p.m., Deputy Armstrong (not a party to this lawsuit) arrived to assist Defendant Steffen. At that time, Mr. Gilliam had already urinated on himself. "Approximately 10-20 minutes after Inmate Gilliam urinated on himself, Deputy Armstrong and [Defendant Steffen] got Inmate Gilliam a change of clothing."[4] *Doc. 25-8 at p.2.*

Defendant Steffen's incident report states that after Mr. Gilliam changed his clothes, he told the deputies that, "he was going to bang his head on the windo[w] and the cement when they left [in order] to hurt himself." *Id.* When the deputies left,

---

[4] In his response to the Defendants' motion, Mr. Gilliam states that he does not "recall" getting a new set of boxers, although he does not contest this fact. *Doc. 27 at p.2.*

4

Mr. Gilliam, as promised, "started to hit his head on the walls and windows." *Doc. 25-5 at p.2.*

At approximately 11:30 p.m., Mr. Gilliam was provided another bathroom break. *Doc. 25-8 at p.2.*

According to the Jail logs, during the five hours Mr. Gilliam was held in the restraint chair, Jail staff checked on him seven times. *Doc. 25-6 at p.3.*

At approximately midnight, Mr. Gilliam was transferred to cell T-2, "a protrusion-free observation cell with no furnishings or fixtures." *Doc. 25-8 at p.2.*

Shortly after Mr. Gilliam was transferred to cell T-2, he requested to use the restroom. In response, officers escorted Mr. Gilliam to the restroom. *Doc. 25-8 at p.2.* According to Defendant Steffen, about 45 minutes later, Mr. Gilliam told him that he needed to use the restroom again and that, if someone did not assist him, he was going to defecate on the floor. *Doc. 25-8 at p.2.* Mr. Gilliam then defecated on the floor,[5] after which he was told that he could not be provided any cleaning supplies because Defendant Smith "said that the door does not open any more that night." *Doc. 25-5 at p.2.*

At approximately 6:15 a.m., Mr. Gilliam was allowed to use the restroom. *Doc. 25-5 at p.2.*

---

[5] Defendants explain that Mr. Gilliam defecated over a metal grate in the floor of his cell. *Doc. 24 at p.14.*

The last suicide check for Mr. Gilliam was at approximately 9:00 a.m. on February 10. *Doc. 25-6 at p.7.*

According to Mr. Gilliam's grievance papers, he was taken back to his unit at approximately 2:00 p.m. on February 10. *Doc. 25-3 at p.1.*

C.   Excessive Force

As a pre-trial detainee at the time of the incident, Mr. Gilliam's excessive-force claim is analyzed under the Fourteenth Amendment. To prevail on his excessive-force claim, Mr. Gilliam must demonstrate that "the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2472-73 (2015) (holding that the defendant's subjective state of mind is irrelevant). When making this determination, the Court must consider: (1) the need for force; (2) the relationship between that need and the degree of force used; (3) the threat the officer reasonably perceived; (4) the extent of injury inflicted; (5) whether force was used to punish or for a legitimate purpose, such as maintaining order or security; and (6) whether a reasonable officer on the scene would have used such force under similar circumstances. *Id.*; *Jackson v. Buckman*, 756 F.3d 1060, 1067 (8th Cir. 2014).

Here, it is undisputed that Mr. Gilliam's threats to commit suicide prompted Defendants to place Mr. Gilliam in the restraint chair. Even after being placed in the restraint chair, Mr. Gilliam continued to threaten to harm himself. While restrained,

6

Jail staff consistently monitored Mr. Gilliam, and he was released from the restraint chair within five hours.

It was constitutionally permissible to place Mr. Gilliam, a suicidal inmate, in restraints. *Norris v. Engles*, 494 F.3d 634, 639 (8th Cir. 2007) (finding no constitutional violation where a pretrial detainee, who threatened to kill herself, was handcuffed, shackled, and chained to a floor grate for approximately three hours); *Hinds v. Langston*, No. 3:07-cv-00091-WRW, 2008 WL 276293 (E.D. Ark. Jan. 30, 2008) (unpublished opinion) (finding no constitutional violation where a pretrial detainee was confined in a restraint chair for two hours after he verbally threatened a jailer); *Blakeney v. Rusk County Sheriff*, No. 03-40180, 2004 WL 442672 (5th Cir. March 11, 2004) (unpublished opinion) (finding no constitutional violation where a disruptive pretrial detainee was confined in a restraint chair for twenty hours, but was allowed to use the bathroom and given water).

Here, there is no evidence that any Defendant placed Mr. Gilliam in the restraint chair as punishment, rather than for protection. In addition, there is no evidence that the use of the restraint chair was excessive given the situation. Without any such evidence, Mr. Gilliam has failed to create any genuine issue of material

fact regarding his excessive-force claim and Defendants are entitled to judgment as a matter of law on this claim.[6]

### D. Unconstitutional Conditions of Confinement

As a pre-trial detainee, Mr. Gilliam's claims regarding the unconstitutional conditions of his confinement are analyzed under the Due Process Clause of the Fourteenth Amendment. *Bell v. Wolfish*, 441 U.S. 520, 535 n. 16 (1979); *Stearns v. Inmate Servs. Corp.*, 957 F.3d 902, 905 (8th Cir. 2020). Under *Bell*, the government may lawfully detain a defendant before trial and subject him to jail restrictions and conditions, "'so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution.'" *Stearns*, 957 F.3d at 907 (quoting *Bell*, 441 U.S. at 536–37). In determining whether a detainee's conditions of confinement constitute punishment, courts consider the totality of the circumstances, including the duration of the allegedly harsh conditions. *Stearns*, 957 F.3d at 909; *Owens v. Scott County Jail*, 328 F.3d 1026, 1027 (8th Cir. 2003); *Smith v. Copeland*, 87 F.3d 265, 268-69 (8th Cir. 1996); *Green v. Baron*, 879 F.2d 305, 309 (8th Cir. 1989).

---

[6] In addition, although Mr. Gilliam alleges that the restraints were "excessively tight," he does not allege that he suffered any injury as a result of being restrained. Furthermore, there is no evidence that he requested any medical treatment as a result of the restraints. Although "[t]he degree of injury should not be dispositive," it is a factor that may be considered in analyzing an excessive-force claim. *Chambers v. Pennycook*, 641 F.3d 898, 907 (8th Cir. 2011) (a detainee must suffer more than *de minimis* injuries to support an excessive-force claim based on the use of handcuffs).

Under the Fourteenth Amendment, conditions of confinement are deemed impermissibly punitive if they "'deprive[] inmates of the minimal civilized measures of life's necessities.'" *Owens*, 328 F.3d at 1027 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)); see also *Green*, 879 F.2d at 309-10 (citations omitted) (pretrial detainees have a "right to a safe and healthy environment," and must be provided "basic human necessities," including adequate food, clothing, shelter, personal hygiene, and sanitation). The length of time that a detainee was subjected to unconstitutional conditions is a "critical factor" in the analysis. *Smith*, 87 F.3d at 269.

Here, Mr. Gilliam alleges that: (1) he was forced to urinate himself while being held in the restraint chair; (2) he was forced to defecate on the floor of his cell, then sleep on the floor of his cell; and (3) although his cell was extremely cold, Defendants denied his requests for a blanket.

Both the Eighth Circuit Court of Appeals and this Court have held that conditions far worse than those alleged by Mr. Gilliam did not violate the Constitution. See *Goldman v. Forbus*, 17 Fed. Appx. 487, 488 (8th Cir. 2001) (unpublished opinion) (six nights sleeping on the floor and being sprinkled with urine was not a constitutional violation); *Smith v. Copeland*, 87 F.3d 265, 269 (8th Cir. 1996) (no constitutional violation when a pretrial detainee was subjected to raw sewage for four days); *Seltzer-Bey v. Delo*, 66 F.3d 961, 963-64 (8th Cir. 1995) (no

constitutional violation where inmate was in strip cell for two days without clothing, bedding, or running water, with a concrete slab for a bed, and cold air blowing on him); *Williams v. Delo*, 49 F.3d 442, 444 (8th Cir. 1995) (no constitutional violation where prisoner was in a strip cell for four days without clothes, mattress, running water, a flushable toilet, bedding, mail, hot food, and hygiene supplies); *Whitnack v. Douglas County*, 16 F.3d 954, 958 (8th Cir. 1994) (no constitutional violation from exposure to "deplorable" unsanitary cell conditions for "not more than 24 hours"); *Cosey v. Ross*, No. 4:16-cv-00763-JTK, 2017 WL 5949581, at *4 (E.D. Ark. Nov. 30, 2017) (no constitutional violation when inmate alleged that "he sat in soiled clothes for two days . . . [without] additional facts indicating Defendants refused to allow him to change his clothes or clean himself up using the sink in his cell"); *Bargo v. Hobbs*, No. 4:14-cv-00393-KGB, 2017 WL 763923 (E.D. Ark. Feb. 27, 2017) (no constitutional violation where prisoner temporarily assigned to field duty was forced to urinate and defecate in the fields, without access to a portable toilet, and without the ability to sanitize hands before eating); *Stricklin v. Roper*, No. 4:16-cv-00673-JTK, 2017 WL 2274337, at *4 (E.D. Ark. May 24, 2017) ("placement of plaintiff face down in his cell in the toilet water did not violate a clearly established right").

    The undisputed evidence shows that Defendant Steffen requested assistance when Mr. Gilliam asked to use the restroom while he was held in the restraint chair. In addition, after Mr. Gilliam was transferred to cell T-2, he was permitted to use the

10

restroom multiple times. Furthermore, in Defendant Wells's affidavit attached to the Defendants' motion, Defendant Wells testified that the thermostat in cell T-2 was set at 68 degrees. *Doc. No. 25-9 at p.1*. Defendant Wells explains that, based on Mr. Gilliam's threats to harm himself, he denied Mr. Gilliam's requests for a blanket. *Doc. 25-9 at p. 1*.

Based on these facts, the Court concludes that Mr. Gilliam's conditions, while uncomfortable, were not unconstitutional. Importantly, Mr. Gilliam was exposed to these unpleasant conditions for a relatively short period of time. Even more importantly, Mr. Gilliam was subjected to a restraint chair and a special cell due to his suicidal state. Based on the totality of the circumstances, Mr. Gilliam's restraint for five hours, followed by his detention in cell T-2 for 36 hours, *both of which were done for his own protection*, did not constitute punishment. Accordingly, Defendants are entitled to judgment as a matter of law on this claim.

E.   Equal Protection

Mr. Gilliam also claims that the Defendants discriminated against him based on his race. An inmate bringing an equal protection claim must show intentional or purposeful discrimination. *Klinger v. Dep't. of Corr.*, 31 F.3d 727, 733 (8th Cir. 1994). "The heart of an equal protection claim is that similarly situated . . . inmates are treated differently and that this difference in treatment bears no rational relations to any legitimate penal interest." *Weiler v. Purkett*, 137 F.3d 1047, 1051 (8th Cir.

1998). Therefore, an equal protection analysis begins with this question: Has Mr. Gilliam alleged facts showing that he was treated differently from others who were similarly situated? *Rouse v. Benson*, 193 F.3d 936, 942 (8th Cir. 1999).

Here, Mr. Gilliam alleges that Inmate Sullivan, a white inmate, was allowed to sign a waiver to return to his unit after he had been placed on suicide watch. Mr. Gilliam complains that he was not provided the same opportunity because he is a black.

Other than his conclusory allegations, Mr. Gilliam has not provided any evidence to support this claim. He has not shown that any of the Defendants intentionally discriminated against him. Furthermore, he has not presented evidence that he and Inmate Sullivan were similarly situated. The Court is unaware of any of the circumstances regarding Inmate Sullivan's detention or the reasons why he was placed on suicide watch. Without such evidence, the Court cannot conclude that the Defendants discriminated against Mr. Gilliam based on his race. Accordingly, Defendants are entitled to judgment as a matter of law on Mr. Gilliam's equal protection claim.

F. Retaliation

To prove a retaliation claim, Mr. Gilliam must present evidence: (1) that he engaged in constitutionally protected activity; (2) that Defendants took adverse action against him that would chill a person of ordinary firmness from engaging in

that activity; and (3) that retaliation was a motivating factor for the adverse action. *Waters v. Madson*, 921 F.3d 725, 741-45 (8th Cir. 2018); *Lewis v. Jacks*, 486 F.3d 1025, 1028 (8th Cir. 2007); *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004); *Cornell v. Woods*, 69 F.3d 1383, 1387–88 (8th Cir. 1995) (internal citation omitted) (inmate "must show that impermissible retaliation was the actual motivating factor for his transfer"). Furthermore, "[the] lack of a temporal connection between the protected activity and the alleged retaliation dispels any inference of a causal connection." *Lewis*, 486 F.3d at 1029.

Again, Mr. Gilliam has not come forward with any evidence of the Defendants' retaliatory motive. Mr. Gilliam's allegations are merely speculative. Accordingly, Defendants also are entitled to judgment as a matter of law on Mr. Gilliam's retaliation claim.

G.   Official Capacity Claims

Official-capacity claims against the County Defendants are, in effect, claims against Lonoke County. *Parrish v. Ball*, 594 F.3d 993, 997 (8th Cir. 2010). Local governments such as Lonoke County can be held liable in cases such as this only when an employee violates a prisoner's rights while carrying out a county policy or custom. *Monell v. New York Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *Jenkins v. County of Hennepin, Minn.*, 557 F.3d 628, 632 (8th Cir. 2009). Here, Mr. Gilliam

does not allege that he suffered any injury as a result of a Lonoke County policy or custom. Official-capacity claims, therefore, should be dismissed.

## IV. Conclusion:

The Court recommends that the Defendants' motion for summary judgment (*Doc. 23*) be GRANTED and that Mr. Gilliam's claims be DISMISSED, with prejudice.[7]

DATED, this 10th day of June, 2021.

_____
UNITED STATES MAGISTRATE JUDGE

---

[7] Defendants also argue that they are entitled to qualified immunity. Because the Court concludes that Mr. Gilliam has not presented evidence that his constitutional rights were violated, there is no need to address qualified immunity as an alternative reason for granting Defendants' motion for summary judgment. *A.H. v. St. Louis County*, 891 F.3d 721, 726-27 (8th Cir. 2018) ("As we agree with the district court that Plaintiffs failed to prove a violation of Hartwig's Fourteenth Amendment rights, we need not address qualified immunity."); *Schmidt v. City of Bella Villa*, 557 F.3d 564, 574 (8th Cir. 2009) ("Since we find no constitutional violation, we need not address the issue of qualified immunity.").